## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| VICTOR ROSARIO, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Lowell Police Officers HAROLD G. | ) | |
| WATERHOUSE, JOHN GIUILFOYLE, | ) | |
| GARRETT SHEEHAN, JOHN R. | ) | |
| NEWELL, GEORGE H. GENTLE, | ) | |
| JOSEPH M. McGARRY, LARRY B. | ) | |
| McGLASSON, WILFRED DOW, JOHN | ) | |
| R. MYERS, and UNKNOWN | ) | |
| OFFICERS OF THE LOWELL POLICE | ) | |
| DEPARTMENT; WILLIAM M. | ) | |
| GILLIGAN and UNKNOWN | ) | |
| MEMBERS OF THE LOWELL FIRE | ) | |
| DEPARTMENT; Massachusetts State | ) | |
| Police Officer DAVID A. COONAN, and | ) | |
| UNKNOWN OFFICERS OF THE | ) | |
| MASSACHUSETTS STATE POLICE, | ) | |
| and the CITY OF LOWELL, , | ) | **JURY TRIAL DEMANDED** |
| | | |
| Defendants. | | |

## COMPLAINT

Plaintiff, VICTOR ROSARIO, by his attorneys LOEVY & LOEVY, complains

of Lowell Police Officers HAROLD G. WATERHOUSE, JOHN GIUILFOYLE,

GARRETT SHEEHAN, JOHN R. NEWELL, GEORGE H. GENTLE, JOSEPH M.

McGARRY, LARRY B. McGLASSON, WILFRED DOW, JOHN R. MYERS, and

UNKNOWN OFFICERS OF THE LOWELL POLICE DEPARTMENT; WILLIAM

M. GILLIGAN and UNKNOWN MEMBERS OF THE LOWELL FIRE

DEPARTMENT; Massachusetts State Police Officer DAVID A. COONAN,

UNKNOWN OFFICERS OF THE MASSACHUSETTS STATE POLICE, and the

CITY OF LOWELL, Massachusetts, as follows:

## INTRODUCTION

1.     Plaintiff Victor Rosario was wrongly accused and convicted of arson

and the murders of eight people who died in the fire attributed to the arson. The fire

occurred on Decatur Street in Lowell, Massachusetts in March 1982.

2.     Plaintiff did not commit the crime.

3.     There was no legitimate evidence connecting Plaintiff to the fire. In

fact, all of the evidence suggested that he had come upon the fire after it had

started and had unsuccessfully tried to save the people inside the home.

4.     There was also no reliable evidence that the fire was even caused by

arson. To the contrary, all signs pointed to the fire being accidental.

5.     Nonetheless, Defendants fabricated evidence in order to quickly "solve"

a high-profile tragedy. In particular, they fabricated a false narrative that Plaintiff

and two brothers, Felix and Gardo Garcia, each threw a burning Molotov cocktail

into the building. The Defendants did so despite the fact that no physical evidence

supported their theory. Among other things, there was no evidence of the use of an

incendiary device or of fire accelerant present at the scene. It was well known at the

time, including by Defendants, that the use of a Molotov cocktail would leave tell-

tale evidence at the scene of a fire, but none was found at the scene of this fire.

6.     To support their false story, Defendants coerced and fabricated a

purported "confession" from Plaintiff. Statements attributed to Plaintiff were

coerced by Defendants, who used well-known illegal tactics during their interrogation of Plaintiff such as outright lies, coercion, threats, mistreatment, and sleep deprivation. Finally Plaintiff was given a statement written in English, which he could not read and the contents of which were not told to him, and forced to sign it with false promises that only if he signed it could he go home. Moreover, it was obvious to Defendants at the time of the "confession" that Plaintiff was in an extremely deteriorated mental state—which the Defendants unlawfully exploited to close the case.

7.     In order to ensure that Plaintiff would be charged and prosecuted, Defendants also fabricated an eyewitness identification to fit their theory of the fire.

8.     Based on the force of the fabricated evidence and Plaintiff's false confession, Plaintiff was charged, prosecuted, and wrongly convicted of arson and multiple murders. He was sentenced to eight concurrent life sentences. Plaintiff was condemned to die in prison for something he had not done.

9.     On September 8, 2017, after Plaintiff had spent more than three decades behind bars, the Commonwealth of Massachusetts dropped all charges against him.

10.     Plaintiff now seeks justice for the harm that Defendants caused and redress for the loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

11.     This action is brought under 42 U.S.C. § 1983 and Massachusetts law

to redress Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

12.     This Court has jurisdiction of Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims under 28 U.S.C. § 1367.

13.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. Moreover, on information and belief], many of the Defendants reside in Massachusetts and are subject to the personal jurisdiction of the courts in this judicial district.

## PARTIES

14.     Plaintiff Victor Rosario is a man who spent 32 years in prison for crimes he did not commit.

15.     Defendants Harold G. Waterhouse, John Giuilfoyle, Garrett Sheehan, John Newell, George G.H. Gentle, Joseph Mcgarry, Larry B. Mcglasson, Wilfred Dow, John R. Myers, and Unknown Officers of the Lowell Police Department are current or former officers of the Lowell Police Department. These Defendants were responsible for investigating crimes, including the crime at issue in this case, and for supervising other police officer Defendants. They committed, facilitated, and approved the constitutional violations at issue in this case.

16.     Defendant William M. Gilligan is a current or former member of the Lowell Fire Department. He was responsible for investigating fire-related crimes, including the crime at issue in this case, and for supervising other police and/or fire

officer Defendants. Defendant Gilligan committed, facilitated, and approved the constitutional violations at issue in this case.

17. Defendant City of Lowell, Massachusetts, is a municipality of the State of Massachusetts, which oversees the Lowell Police Department and the Lowell Fire Department. Each of the Defendants referenced above was employed by the City of Lowell or was acting as an agent of the City of Lowell, the Lowell Police Department, and/or the Lowell Fire Department while conducting the investigation described in this Complaint. Defendant City of Lowell is therefore liable for all torts committed by these Defendants pursuant to the doctrine of *respondeat superior*. Defendant City of Lowell is additionally responsible for the policies and practices of the Lowell Police Department and Lowell Fire Department that were implemented by Defendants in this case. Finally, Defendant City of Lowell is responsible under Massachusetts law for any judgment entered against Defendants.

18. Defendants David A. Coonan and Unknown Officers of the Massachusetts State Police are current or former officers of the Massachusetts State Police. These Defendants were responsible for investigating crimes, including the crime at issue in this case, and for supervising other police officer Defendants. These Defendants committed, facilitated, and approved the constitutional violations at issue in this case. At all times relevant to the events described in this Complaint, each of the Defendants acted under color of law, within the scope of his employment, and as an investigator. Each of the Defendants is sued in his individual capacity, unless otherwise noted.

## FACTS

### The Fire and Deaths of Eight People

19.     At approximately 1:00 a.m. on March 5, 1982, a fire occurred at 32-36 Decatur Street, Lowell, Massachusetts.

20.     Eight people died in the fire.

21.     The Lowell Police and Fire Departments responded to the scene of the fire, investigated the scene, gathered evidence, and spoke to neighbors.

### Plaintiff Had Nothing to Do With Starting the Fire and Instead Tried to Save the Victims

22.     Plaintiff had absolutely nothing to do with starting the fire. Instead, that evening, Plaintiff was out with friends, Felix and Edgardo Garcia.

23.     On his way home, Plaintiff and the Garcias passed by 32-36 Decatur Street and saw that the house was on fire.

24.     Hearing the screams of people trapped inside the burning building, Plaintiff broke a window and tried to go into the building to rescue the families. But the fire was already too hot, and he was injured trying to get into the building.

25.     After trying to help the victims, Plaintiff voluntarily introduced himself to police and medical professionals on the morning of the fire. He was treated for cuts to his hand and arms that were caused by breaking the window to pull people out of the fire.

26.     Rather than investigate the fire, however, the Defendants short-circuited the process and myopically focused on Plaintiff in an effort to solve what they said was a crime.

6

### The Physical Evidence Never Supported the Theory that the Fire Was Started by Arson Fire

27.     To this day, there is no evidence that a fire was deliberately set and, if there were such evidence, who the culprit might be because Defendants fabricated evidence against an innocent man.

28.     Instead, all of the evidence at the crime scene was consistent with an accidental fire. For example, the burn patterns were entirely consistent with a fire that started without the use of an accelerant.

29.     In fact, there was no physical evidence at all of an accelerant being the source of the fire. The state crime lab tested the building material at the source of the fire and expressly told Defendants that it found no accelerant.  The FBI tested the glass fragments found at the scene of the fire  and found no evidence of materials that could have been used for Molotov cocktails. The can of liquid found at the scene was vegetable oil

30.     In addition, Defendants were made aware of other identified possible accidental sources of the fire, which they investigated and failed to document the exculpatory findings and/or documented those findings but did not disclose them to the prosecution or defense.

### There Was Never Any Evidence Supporting that the Fire was Caused by Arson, Specifically, Arson Using a Molotov Cocktail

31.     There was absolutely no evidence at the scene that the fire had been started intentionally.

32.     To get around this obvious problem, the Defendants manufactured false evidence about the use or presence of Molotov cocktails or other incendiary devices, the presence of a fuel accelerant, and/or multiple points of origin of the fire. This fabricated evidence was inconsistent with the crime scene and all legitimate conclusions that could be drawn from it.

33.     For example, if a Molotov cocktail had been used, fire science demonstrated even at the time of the investigation that some traces of it would be available for evidence.

34.     Yet, there was no glass found at the scene from such a device, no wicks, no ignitable liquid residue, and all tests for accelerants came back negative.

35.     Similarly, the Defendants fabricated findings—known at the time to be false—that there were multiple places where the fire started because there was no connection between the "points of origin."

36.     Furthermore, fire science has shown that it is physically impossible for Molotov cocktails to have started a fire of the magnitude of the fire at issue.

37.     But the scientific evidence demonstrated the exact opposite; that the fire progression and damage were normal and consistent with an accidental (non-accelerated fire).

38.     Finally, Defendants intentionally failed to document the results of any investigation related to possible accidental sources of the fire such as the presence of a space heater (a common source of accidental fires at the time) or that a woman who died in the fire used multiple devotional candles and had been recently

8

drinking a lot of alcohol. Instead, this evidence was buried from the prosecution and defense so that the Defendants' fabrications could not be properly challenged.

**Defendants Arrested Plaintiff for the
Unproven Arson and the Deaths Caused by the Fire**

39.     Defendants focused on Plaintiff as the culprit of the nonexistent crime because  he gave his name to   the local newspaper reporter who described how the Plaintiff had hurt himself while trying to enter the building and help the victims of the fire, . In short, Plaintiff was an easy target.

40.     The fire was a high-profile incident, and Defendants were under pressure to quickly arrest a suspect.

41.     In the morning of March 6, 1982, Defendant Waterhouse became aware of Plaintiff because he had been treated by the Red Cross for his wounds.

42.     Shortly afterward, Defendants decided to focus on Plaintiff as the "culprit" despite the lack of any physical or other evidence tying him to the "crime."

43.     In fact, during the afternoon or evening of March 6, Defendants met in a Zayre's store parking lot to develop a strategy about how they would manufacture evidence against Plaintiff.

44.     That same afternoon, on March 6, 1982, Defendants went to Plaintiff's house, and took Plaintiff to the Lowell Police Department to interrogate him.

**Defendants Fabricated a False Confession from Plaintiff**

45.     From the evening of March 6 through the early morning of March 7, 1982, Defendants, held Plaintiff alone in custody and wrote a fabricated, incriminating statement in English that they forced Plaintiff to sign even though

Plaintiff did not read, write, or understand English and nobody explained the statement to him in his native language.

46.     Multiple officers participated in the interrogation, and they used Ramon A. Nieves as a translator even though Mr. Nieves was not trained to provide language translation.

47.     The officers obtained this involuntary statement using outright lies, coercion, threats, mistreatment, sleep deprivation, exploiting a known and obvious mental health breakdown, and manipulation of a language barrier.

48.     At the time that Defendants fabricated evidence against Plaintiff, he was in the midst of a mental breakdown and was particularly susceptible to intimidation and threats. His fragile condition was obvious to Defendants.

49.     Defendants took no steps to interrupt or adapt their questioning of Plaintiff in response to his obvious  incoherence and total lack of understanding of his situation

50.     Instead, they did the opposite: they acted in concert to exploit Plaintiff's vulnerabilities to secure a confession, regardless of whether it was true or false, knowing that there was obvious evidence to suggest that Plaintiff was not responsible for the arson and murders including his repeated denials of any involvement in the fire.

51.     In particular, before Defendants took Plaintiff into custody, Plaintiff was traumatized by seeing the fire— and hearing the screams of children dying in the fire. The extreme suffering caused Plaintiff intense psychological distress. At

the time of his interrogation, Plaintiff was crying hysterically and his eyes and face were red from crying and anxiety. Plaintiff was reliving the trauma of the fire— hearing voices, and smelling the smoke.

52.     In addition to the trauma of the fire, Plaintiff was suffering from Delirium Tremens as a result of alcohol withdrawal. Plaintiff had been a heavy drinker since childhood but had stopped suddenly the night of the fire. The effects of this cessation of the intake of alcohol, in addition to Plaintiff's vulnerable mental state, were readily apparent and obvious to Defendants.

53.     During the interrogation, Plaintiff began to hear demons saying to him, "death, death," and was hearing voices generally, and saying, "I am Victor Rosario, the Son of God. Jesus Christ is in me." He also said that, "the devil" was in him. Indeed, Plaintiff's unstable mental condition was obvious to Defendants throughout the entirety of their interactions with him.

54.     Nonetheless, for at least six continuous hours Defendants interrogated Plaintiff, depriving him of sleep during the night of March 6 and morning of March 7, 1982. For hours, Defendants held Plaintiff inside an interrogation room.

55.     Defendants' questioning was aggressive and they threatened Plaintiff on multiple occasions throughout the night, including, but not limited to, falsely telling him *inter alia* that his two friends had already implicated him and that he would be sentenced to death if he did not confess.

56.     As Defendants preyed on Plaintiff's weakened mental condition during the lengthy interrogation in the early hours of the morning, Plaintiff began yelling

and screaming, knelt down, grabbed the chair, cried and screamed, "no," "Oh God,

Oh God," and "please stop." He also was hallucinating and saying, "Get it off me," as

he appeared to rub insects off his arm, a classic symptom of delirium tremens

known to the Defendants.

57.    Plaintiff was obviously delusional during the interrogation and showed

no signs of comprehension.

58.    Rather than stop the interrogation, Defendants continued to coerce

Plaintiff to incriminate himself by preying on his mental condition.

59.     The Defendants also failed to give Plaintiff any effective *Miranda*

warnings. Further ensuring that Plaintiff's constitutional rights were violated, the

Defendants engaged in coercive, deceptive, and diversionary tactics that would have

deprived *Miranda* warnings of any force, even if effective warnings had been given.

At no point did Plaintiff knowingly or voluntarily waive his right to remain silent or

his right to have counsel present at the interrogation.

60.    At no point did the Defendants heed Plaintiff's repeated denials of

involvement in the fire and stop their physically and mentally abusive questioning.

Defendants' uninterrupted accusations and questioning continued as if Plaintiff had

said nothing at all.

61.    Defendants also made false promises to Plaintiff to induce him to sign

the statements, saying that he would be allowed to leave if he signed them. It was

clear that Plaintiff was incapable of understanding either of the statements he

signed.

62.     After hours of early morning interrogation, Defendants' abuse finally broke Plaintiff down. Plaintiff suffered a complete physical and mental collapse and, in order to stop Defendants' relentless assaults, he signed two false, incriminating statements that were fabricated by Defendants.

63.     Defendants wrote both statements in English.  The statements falsely implicated Felix and Gardo Garcia, in addition to Plaintiff as co-conspirators to make and use Molotov cocktails to burn the building.

64.     Plaintiff did not speak English fluently and did not understand written English in 1982. Moreover, the statements were never read to Plaintiff in English or in Spanish before Defendants forced Plaintiff to sign them.

65.     It was obvious to Defendants that Plaintiff did not understand written or spoken English—they had used Spanish-English translators when they spoke to Plaintiff earlier at his home and during the interrogation.

66.     The statements contained admissions written by Defendants and falsely attributed as verbal statements by Plaintiff, though Plaintiff had never made those statements to Defendants during the interrogation or at any other time.

67.     Rather, Defendants provided all of the information contained in the written statements.

68.     Since the evidence supports that there was insufficient evidence of arson generally and no proof of the use of Molotov cocktails specifically, Plaintiff's written statements (in English) admitting those nonexistent facts is simply based on falsehoods. There was no reason for Plaintiff to voluntarily make the false

statements attributed to him. They were fabricated by Defendants to comport with the false statements and evidence The statements were used against Plaintiff during the criminal case.

69.     In committing the misconduct described above, the Defendants made an agreement with each other and with others currently unknown to Plaintiff, to individually, jointly, and/or in conspiracy secure a false and involuntary confession from Plaintiff and to use that confession to initiate and perpetuate false criminal charges against Plaintiff.

### Defendants Fabricated and Suppressed Additional Evidence About the Circumstances of the Interrogation

70.     In addition to fabricating false statements and attributing them to Plaintiff, Defendants fabricated other evidence to bolster the forced confession for use in the criminal case.

71.     Defendants lied and wrote false reports about the circumstances of their interrogation of Plaintiff and about how they obtained the written statements that they attributed to him.

72.     Similarly, Defendants wrote false reports stating that Plaintiff verbally confessed to the crime and described his involvement in it. But the statements they reported were never said by Plaintiff. Likewise, the Defendants destroyed the contemporaneous notes they took of Plaintiff's interrogation, which also would have showed that Plaintiff never made any of the statements attributed to him.

73.     Moreover, Defendants' false reports included lies about the manner in which they had questioned Plaintiff in order to make the statements appear voluntary and true, when in fact Plaintiff had been forced to sign the false statements that he did not understand.

74.     Defendants also created and induced false statements from Ramon Nieves, which falsely depicted the circumstances of Plaintiff's interrogation

75.     Defendants also fabricated evidence in the form of a photograph, which they falsely reported that Plaintiff had identified as the window through which Felix Garcia threw a Molotov cocktail. This was a complete lie.

76.     Moreover, Defendants drafted police reports that included false statements about the Molotov cocktail that they attributed to Plaintiff.

77.     On March 8, 1982, the day after Defendants secured the false statements from Plaintiff, they attempted to have Plaintiff demonstrate his actions in setting the fire. Plaintiff could not do so because he was totally innocent and he made clear that his confession was totally fabricated. Unwilling to undermine their fabricated confession, Defendants did not document what happened or suppressed the documentation.

78.     Defendants acted under the policy and practice of the City of Lowell, which contracted and/or otherwise entered into an agreement with property insurers for the City of Lowell to provide evidence of arson in exchange for material support, including financing to the City of Lowell from insurers. This created a financial incentive for Defendants to make findings of arson.

79. The exculpatory evidence of this policy and practice was not disclosed to Plaintiff.

**Defendants Fabricated the Existence of False Physical Evidence**

80. Defendants' also made false reports about physical evidence allegedly obtained during search warrants, which falsely suggested a tie between physical evidence at Plaintiff's residence and physical evidence from the crime scene.

81. Along with Plaintiff's landlord, Defendants went to the apartment building where Plaintiff lived.

82. In the basement of the apartment building were a gas can and cans of paint.

83. Plaintiff's landlord, Joseph Simao, told police that the gasoline can was his for use in a space heater to keep pipes from freezing and that Mr. Simao had been using the paint as part of a drywall project.

84. Defendants falsely attributed the gas can and paint cans as being used by Plaintiff to start the fire.

85. To bolster their fabricated theory about the use of Molotov cocktails, Defendants staged the basement to look like there were Miller beer bottles with the gas can and paint can (tipped over) and took photographs of that staged scene. In fact, when Simao took police to the basement, he did not see a beer bottle near his gas can and paint, nor did Simao see the scene that was photographed to make it look like it could have been used to make Molotov cocktails.

86.    Defendants suppressed from the prosecution and defense the information they learned from Simao, the fact that the photographs had been staged, and the circumstances of the search.

87.    Defendants bolstered the staged physical evidence by drafting a false affidavit two days after Plaintiff's interrogation. In that affidavit, Defendants included a false statement that Plaintiff had said during the interrogation that he had seen a bottle of Red Devil paint thinner at the apartment of Felix before and after the fire and that it may have been used to make the Molotov cocktails. Defendants knew that the sworn affidavit saying that Plaintiff had mentioned the Red Devil paint thinner during the interrogation was a total fabrication.

88.    Defendants fabricated that detail to support their fictional story.

### Defendants Fabricated Eyewitness Evidence

89.    Defendants also manufactured eyewitness evidence to implicate Plaintiff in setting the fire.

90.    The false evidence included a fabricated eyewitness identification.

91.    In particular, on March 6, 1982, Defendants interviewed Edward Evans, who lived across the street from the fire.

92.    They showed Mr. Evans a photo array that included Plaintiff's photograph. Mr. Evans did not identify Plaintiff as being present the night of the fire.

93.    Moreover, Mr. Evans provided a physical description of someone that he allegedly saw, at about 1:00 a.m. (after the fire was reported and fire department

personnel had already responded), throwing something into the house. That description did not match Plaintiff.

94.     Nonetheless, on March 13, 1982 (despite having initially not identified Plaintiff's photo and giving a description that did not match Plaintiff after many interactions with Defendants), Defendants manipulated Mr. Evans into falsely identifying Plaintiff as being present at the scene before the fire started. Defendants then falsely reported that Evans had identified Plaintiff five days earlier, on March 8, 1982, after seeing his picture in the newspaper.

95.     Defendants did not document that the identification of Plaintiff was fabricated.

96.     Moreover, Defendants fabricated additional evidence they claimed came from Mr. Evans. Defendants reported that Evans said he saw Plaintiff throw an object through the window of the first floor apartment immediately before the fire started.

97.     Evans, however, did not identify that he saw any flame that would have been visible from a lit Molotov cocktail in the dark or any flame or explosion when it would have supposedly ignited. The lack of these details is evidence that his statements were manipulated to give false (albeit incomplete) evidence of a purported crime.

98.     Defendants further fabricated a witness statement from Elisa Quinones, who was present the night of the fire.

99.    On or about March 11, 1982, Defendants wrote a statement in English and told Ms. Quinones to sign the statement.

100.    Ms. Quinones did not read or speak English and nobody read or translated the statement to her in her native language, Spanish.

101.    There were numerous false statements attributed to Ms. Quinones in her English, written statement, including that she saw Mr. Garcia with two other Spanish guys standing in front of the burning building; that those men were throwing small glass bottles, which looked like seven ounce beer bottles; that as soon as they threw in the bottles, the flames got bigger; and that she saw Mr. Garcia's photograph in the newspaper along with the two other men that were with him in the fire. None of this information was true; it was all fabricated by the Defendants to try to shore up false evidence against Plaintiff.

102.    The actual evidence in the case, including from witnesses at the scene, excluded Plaintiff as a suspect. But the Defendants' myopic focus on Plaintiff meant that that evidence was ignored or buried.

**Defendants Suppress Evidence of Alternate Suspects**

103.    Defendants also suppressed exculpatory evidence related to investigations of other persons who were possible suspects in the fire that Defendants claimed was an arson.

104.    For instance, multiple witnesses identified a man named Epifanio Luna Santiago as being present at or near the scene of the fire. Indeed, Mr. Evans described the person he saw before the fire as 5'5" or 5'6" which would matched

Luna Santiago's height but not Plaintiff's, who was 5'2".

105.   Defendants interviewed Luna Santiago, who gave different and inconsistent accounts of where he was before the fire. Police investigated those inconsistencies, but failed to document that investigation.

106.   Similarly, Defendants investigated other alternate suspects, but buried the information they developed that would have pointed toward their guilt—and not Plaintiff's. That includes evidence that three to four people (two men and one to two women) were seen walking with suitcases away from the scene of the fire toward Merrimack Street as the fire raged; that a man who lived at 67 Salem Street, Second Floor, Lowell, MA had threatened to kill one of the fire victims; evidence that a woman had burned the building on Decatur Street over a drug deal gone bad; and that other individuals, who had set fire to other buildings before and/or had conflicts with the Decatur Street residents were involved.

### Plaintiff's Wrongful Conviction and Imprisonment

107.   In 1983, as a result of Defendants' misconduct and the false evidence they created, Plaintiff was charged, prosecuted, and tried by jury. Plaintiff contested guilt at every stage of his arrest and prosecution including testifying on his own behalf at trial.

108.   During the trial, this false evidence was the only thing suggesting that Plaintiff was guilty of arson.

109.   Moreover, Plaintiff was unable to defend himself because he was denied access to the exculpatory evidence described above.

110.    After a one-week trial, a jury convicted Plaintiff of arson and eight counts of first-degree murder.

111.    Plaintiff's alleged co-conspirators, Felix and Gardo Garcia, were never tried. According to Defendants, this was because there was no probable cause to suspect either of them given the lack of any physical evidence tying them to the scene.

112.    In fact, there was never any physical evidence tying anyone to setting the fire, and Defendants did not have probable cause to suspect Plaintiff's alleged co-conspirators because Defendants were not able to fabricate evidence implicating them as they did with Plaintiff.

113.    Without Defendants' fabricated evidence, there was nothing to support a criminal proceeding against Plaintiff.

114.    Likewise, had Defendants disclosed the exculpatory evidence they suppressed, Plaintiff never would have been arrested, let alone convicted.

**Plaintiff's Damages**

115.    Plaintiff was in his mid-twenties, in the prime of his life, at the time that he was wrongly convicted. He was arrested, prosecuted, and convicted for no reason at all. He would spend the next three decades imprisoned for something he had not done.

116.    Plaintiff's whole life was turned upside down without any warning. A substantial portion of his adulthood has been consumed by the horror of his wrongful imprisonment.

117.    Because of Defendants' misconduct, Plaintiff has missed out on the lives of his family and friends.

118.    Plaintiff was also deprived of opportunities to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

119.    During his decades of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum security prisons.

120.    His unlawful arrest, prosecution, and imprisonment caused him to suffer from extreme trauma and/or mental health problems, which continue to this day.

121.    In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

### Plaintiff's Exoneration

122.    Plaintiff never gave up on proving his innocence.

123.    On May 11, 2017, the Supreme Judicial Court of Massachusetts upheld the order granting Plaintiff a new trial. *Commonwealth v. Rosario*, 477 Mass. 69, 74 N.E.3d 599 (2017).

124.    On September 8, 2017, the Commonwealth of Massachusetts dropped all charges against Plaintiff.

125.    Plaintiff walked out of prison a free man after 32 years of wrongful imprisonment.

## COUNT I
## 42 U.S.C. § 1983 – Due Process

126.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

127.    In the manner described more fully herein, Defendants, while acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

128.    Defendants deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

129.    Defendants fabricated and solicited false evidence, including testimony that they knew to be false, implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

130.    In addition, Defendants produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Plaintiff's purported connection to the crime, contained statements and described events that

were fabricated and that Defendants knew to be false. Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was false.

131.    Defendants also procured false eyewitnesses identifications of Plaintiff, implicating him in the crime, and they used unduly suggestive identification techniques to obtain those false identifications. Defendants used the resulting false identifications to taint Plaintiff's criminal trial.

132.    In addition, Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

133.    Defendants who were supervisors charged with overseeing the investigation of the Decatur Street fire and the other Defendants knew full well of this misconduct, the suppression of exculpatory evidence, and the fabrication of a false case against Plaintiff. These supervisors nevertheless intentionally ignored Defendants' misconduct, and decided to make Plaintiff responsible for a crime he did not commit, rather than directing the officers to go out and fully investigate the fire.

134.    Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

135.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the

rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

136.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

137.    Plaintiff's injuries were caused by the official policies of Defendant City of Lowell and the Lowell Police Department, by the practices and customs of Defendant City of Lowell, the Lowell Police Department, and the Lowell Fire Department as well as by the actions of final policymaking officials for Defendant City of Lowell, the Lowell Police Department, and the Lowell Fire Department. For example, the Lowell Police Department was found to tolerate constitutional violations in 1983. *See Foley v. City of Lowell, Mass.*, 948 F.2d 10 (1st Cir. 1991). Moreover, the City of Lowell entered into agreements to provide its investigative employees (including but not limited to Defendants here) with a financial incentive to make findings of arson.

138.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Lowell promulgated rules, regulations, policies, and procedures governing witness interviews, photo lineups, live lineups, preservation and disclosure of investigative materials and evidence, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, fire/arson investigations, and training, supervision, and discipline of employees and agents of the City of Lowell, including employees and

agents of the Lowell Police Department and Fire Department.

139.    These rules, regulations, policies, and procedures were implemented by employees and agents of Defendant City of Lowell, including the Defendants, who were responsible for conducting investigations of crimes in and around Lowell, Massachusetts.

140.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Lowell had notice of a widespread practice by its officers and agents under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

141.    These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Lowell directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and discipline their officers, agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

142.    The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the City of Lowell, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate

indifference to the problem, thereby effectively ratifying it.

143.    The misconduct described in this Count was undertaken pursuant to the policy and practices of Defendant City of Lowell in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Lowell and the Lowell Police Department, or were actually committed by persons with such final policymaking authority.

144.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

145.    Plaintiff's injuries were caused by officers, agents, and employees of the City of Lowell, the Lowell Police Department, and the Lowell Fire  Department including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT II**
**42 U.S.C. § 1983 – Federal Malicious Prosecution**

146.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

147.    In the manner described above, Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity

and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

148.   In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

149.   The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

150.   Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty, and Massachusetts law does not provide an adequate state-law tort remedy to redress that harm.

151.   In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a possible crime of which he was totally innocent, through Defendants' fabrication and suppression of evidence and their use of unduly suggestive identification procedures.

152.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

153.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical

and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

154.   On September 8, 2017, the judicial proceedings against Plaintiff were terminated in his favor, in a manner indicative of his innocence.

155.   Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Lowell, and by Defendants who were final policymakers for Defendant City of Lowell, in the manner more fully described above.

## COUNT III
## 42 U.S.C. § 1983: Coerced and False Confession
## (Fifth Amendment through the Fourteenth Amendment)

156.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

157.   In the manner described more fully above, Defendants, individually, jointly, and/or in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself involuntarily, falsely, and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

158.   As described more fully above, Defendants participated in, encouraged, and ordered an unconstitutional interrogation of Plaintiff, which caused Plaintiff to make involuntary statements implicating himself in committing arson and the deaths of eight people.

159.    The false statements written by the Defendants and attributed to Plaintiff were used against Plaintiff to his detriment throughout his criminal case. These statements were the reason that Plaintiff was prosecuted and convicted of the arson and murders.

160.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally.

161.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT IV
### 42 U.S.C. § 1983: Coerced Confession
### (Fourteenth Amendment)

162.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

163.    In the manner described more fully above, Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment.

164.    As described in detail above, the misconduct described in this Count was done using psychological and physical coercion. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not

supported by any conceivable governmental interest.

165.    The misconduct described in this Count was objectively unreasonable, and was undertaken and effected intentionally.

166.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT V
## 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

167.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

168.    After the Decatur Street fire, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for murdering the eight victims of the fire, a crime he did not commit, and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

169.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

170.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

171.    The misconduct described in this Count was objectively unreasonable

and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

172.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

173.   Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Lowell, and by Defendants who were final policymakers for Defendant City of Lowell, in the manner more fully described above.

## COUNT VI
## 42 U.S.C. § 1983 – Failure to Intervene

174.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

175.   In the manner described above, during the constitutional violations described herein, one or more Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

176.   As a result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress and permanent physical damage. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

177.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

178.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

179.   Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Lowell, and by Defendants who were final policymakers for Defendant City of Lowell, in the manner more fully described above.

## COUNT VII
## State-Law Claim – Malicious Prosecution

180.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

181.   In the manner described above, Defendants, acting as investigators, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

182.   In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These

judicial proceedings were instituted and continued maliciously, resulting in injury.

183.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

184.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

185.   On September 8, 2017, the judicial proceedings against Plaintiff were terminated in his favor.[1]

## COUNT VIII
## State-Law Claim – Negligence

186.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

187.   Defendants owed Plaintiff a duty to refrain from framing him for a crime he had not committed and to conduct a legal and thorough investigation of the Decatur Street fire that resulted in the accurate identification, arrest, and prosecution of criminal suspects (if it were determined that a crime was committed).

188.   In the manner described more fully above, the actions, omissions, and conduct of Defendants breached this duty.

---

[1] Plaintiff presented his state-law claims included in this Complaint to Defendants, as required by Massachusetts law, on _____. In the absence of action from Defendants, six months from that date, Plaintiff state-law claims will be ripe for adjudication.

189.    The misconduct described in this Count was objectively unreasonable and was undertaken in total disregard of the truth and Plaintiff's clear innocence.

190.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
## State-Law Claim – Intentional Infliction of Emotional Distress

191.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

192.    The actions, omissions, and conduct of Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

193.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer physical injury, emotional distress, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
## State-Law Claim – Negligent Infliction of Emotional Distress

194.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

195.    Pleading in the alternative, Defendants owed Plaintiff a duty to refrain

from framing him for a crime he had not committed and to conduct a legal and thorough investigation of the Decatur Street fire that resulted in the accurate identification, arrest, and prosecution of criminal suspects (if a crime had occurred).

196.    In the manner described more fully above, the actions, omissions, and conduct of Defendants breached this duty.

197.    The misconduct described in this Count was objectively unreasonable. It was reasonably foreseeable that Defendant's actions would cause any reasonable person, including Plaintiff, emotional distress.

198.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer physical injury, emotional distress, and other grievous and continuing injuries and damages as set forth above. His distress is manifested in symptoms such as insomnia, deep depression, and anxiety.

## COUNT XI
### State-Law Claim – Mass. Gen. Laws, Ch. 12, § 11I

199.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

200.    Defendants interfered with Plaintiff's exercise and enjoyment of rights guaranteed to him by the U.S. Constitution and the constitution and laws of the Commonwealth of Massachusetts by fabricating evidence and coercing witnesses into fabricating false identifications against Plaintiff.

201.    Defendants' misconduct deprived Plaintiff of his rights under federal and state law by use of threats, intimidation, and coercion, thereby violating the Massachusetts Civil Rights Act.

## COUNT XII
## State-Law Claim – Civil Conspiracy

202.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

203.   As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

204.   In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

205.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

206.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XIII
## State-Law Claim – Respondeat Superior

207.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

208.    While committing the misconduct alleged in the preceding paragraphs,

Defendants were employees, members, and agents of the City of Lowell, acting at all

relevant times within the scope of their employment.

209.    Defendant City of Lowell is liable as principal for all torts committed

by its agents.

## COUNT XIV
## State-Law Claim – Indemnification

210.    Plaintiff incorporates each paragraph of this Complaint as if fully

restated here.

211.    Massachusetts law provides that public entities are to pay tort

judgments for which employees are liable within the scope of their employment

activities.

212.    Defendants were employees, members, and agents of the City of

Lowell, acting at all relevant times within the scope of their employment in

committing the misconduct described herein.

WHEREFORE, Plaintiff, VICTOR ROSARIO, respectfully requests that this

Court enter a judgment in his favor and against Defendants Lowell Police Officers

HAROLD G. WATERHOUSE, JOHN GIUILFOYLE, GARRETT SHEEHAN, JOHN

R. NEWELL, GEORGE H. GENTLE, JOSEPH M. McGARRY, LARRY B.

McGLASSON, WILFRED DOW, JOHN R. MYERS, and UNKNOWN OFFICERS

OF THE LOWELL POLICE DEPARTMENT;  WILLIAM M. GILLIGAN;

Massachusetts State Police Officer DAVID A. COONAN and UNKNOWN

OFFICERS OF THE MASSACHUSETTS STATE POLICE, and the CITY OF

LOWELL, Massachusetts, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, VICTOR ROSARIO, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

**VICTOR ROSARIO**

BY:   /s/ Debra Loevy
            *One of Plaintiff's Attorneys*

Debra Loevy
LOEVY & LOEVY
311 North Aberdeen, Third Floor
Chicago, IL 60607
(312) 243-5900
debra@loevy.com